

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

In re Application of

CFE International LLC,

        Applicant,

Arbor Glen Consulting, LLC,

        Respondents.

Case No. 1:22-mc-429 LY

DECLARATION OF SAM ANSON IN SUPPORT OF CFE INTERNATIONAL LLC'S APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 PERMITTING IT TO ISSUE A SUBPOENA FOR THE TAKING OF A DEPOSITION AND THE PRODUCTION OF DOCUMENTS FROM ARBOR GLEN CONSULTING, LLC

**FILED EX PARTE AND UNDER SEAL**

I, Sam Anson, hereby declare the following:

1. I am a Senior Managing Director at Guidepost Solutions ("Guidepost"), which is headquartered at 260 Madison Avenue, Third Floor, New York, New York 10016. Guidepost's lines of business include domestic and international investigations, compliance solutions, monitoring, security, and technology consulting.

2. I make this declaration on behalf of CFE International LLC ("CFEi") in support of its *ex parte* application for an order pursuant to 28 U.S.C. § 1782 granting discovery from Arbor Glen Consulting, LLC in aid of a Mexican criminal proceeding (the "Mexican Criminal Proceeding"), described at ¶¶ 17–25 below.

3. I am an individual over the age of 18 and, if called upon, could testify to all matters set forth in this Declaration. The facts stated herein are generally derived from my own personal knowledge and are true to the best of my knowledge, information and belief. To the

extent that the facts stated herein are derived from information supplied to me by others, they are true to the best of my knowledge, information and belief.

### Background

4. I am a private investigator, licensed in the State of California, with more than twenty years of experience in the investigations field. My work has focused on matters in the United States, Mexico, Central and South America, and the Caribbean.

5. My experience includes Foreign Corrupt Practices Act investigations, international tort actions, compliance investigations, and International Centre for Settlement of Investment Disputes arbitrations.

6. Prior to joining Guidepost in 2019, I was, for nine years, the founder and senior partner of Custom Information Services, Inc., a specialized investigations firm focused on the Americas, with offices in Miami, Los Angeles, and Bogota, Colombia.

7. Before founding Custom Information Services, from 2005 to 2010, I led the Latin American and Caribbean operations for Kroll, an international investigations firm, where I had previously served in the Los Angeles office beginning in 2000, including as Managing Director beginning in 2004.

8. My clients have included law firms, investments funds and multi-national corporations.

9. I began my career in 1993 as a journalist for various publications, covering politics and crime, among other topics. I have written and lectured on topics related to international corporate investigations and have conducted training programs for attorneys, investigators and corporate clients. In 1996, I was the recipient of a Los Angeles Press Club award for my investigative reporting and journalism.

10. On August 12, 2021, I was retained by Paul, Weiss, Rifkind, Wharton & Garrison LLP on behalf of its client, CFEi, in my capacity as Senior Managing Director at Guidepost.

11. I was retained to investigate suspected corruption involving former executives at CFEi and its parent, Comisión Federal de Electricidad ("CFE"), Mexico's electrical utility, and certain individuals at Whitewater Midstream LLC and its affiliates and subsidiaries (collectively, "WWM"), described below.

12. Specifically, my team investigated the relationships and transactions between Javier Gutierrez Becerril ("Gutierrez"), a former executive of CFE and the former Chief Operating Officer of CFEi, and Guillermo Turrent Schnaas ("Turrent"), a former executive of CFE and the former Chief Executive Officer of CFEi, on the one hand, and Matthew Calhoun ("Calhoun"), co-founder of and President of Commercial Operations at WWM, on the other. My team also investigated Arlin Travis ("Travis"), currently Senior Vice President of Marketing at WWM and his involvement in these relationships and transactions.

13. During the course of our investigation, my team and I consulted public documents, internal correspondence and materials from CFEi, as well as private sources, to research the activities and transactions involving CFE, CFEi, Gutierrez, Turrent, WWM, Calhoun, and Travis, the substance of which forms the basis of this declaration.

## The Parties

14. CFEi is the wholly owned U.S. subsidiary of CFE, with headquarters in Houston, Texas. Mexican electricity producers and suppliers, and in turn Mexican consumers, rely on CFEi to secure affordable natural gas contracts in the United States to supply Mexico with natural gas to use to generate electricity in Mexico. (*See* Aponte Decl. ¶¶ 4, 9–10).

15. Arbor Glen Consulting, LLC ("Arbor Glen") is an entity incorporated in Delaware by Travis on April 18, 2016 and registered as a foreign company in Texas on May 2,

2019. According to Arbor Glen's Texas Franchise Tax Public Information Report for the year 2021, dated September 13, 2021, Arbor Glen's principal office and principal place of business are 3300 Bee Caves Rd., Suite 650-1211, Austin, TX 78746. According to Arbor Glen's Application for Registration of a Foreign Limited Liability Company, Travis and his wife, Belinda Travis, were Arbor Glen's sole officers when it registered to do business in Texas in 2019; and as of the 2021 Texas Franchise Tax Public Information Report, Travis was the sole officer and President. Travis holds himself out as Arbor Glen's "Principal Consultant." A copy of Arbor Glen's business organization records on file with the Texas Secretary of State and a copy of Travis's LinkedIn profile are annexed hereto as Exhibits 1 and 2, respectively.

16. WhiteWater Midstream LLC is a limited liability company incorporated in Delaware in March 2016 by Calhoun and Christer Rundlof, among others, with its principal place of business in Austin, Texas. WWM is a midstream service provider that operates in the gas delivery and sale business.

## The Mexican Criminal Proceeding

17. Both CFE and CFEi, as well as their directors, officers and personnel, are governed by various Mexican constitutional, criminal, and procurement laws designed to guarantee that public contracts are awarded fairly, transparently, and under the best market conditions available. In addition to imposing open tender guidelines on the procurement process for public contracts, Mexican law also prohibits public servants from engaging with bidders in any way that presents a conflict of interest. The Mexican law declaration in support of CFEi's Section 1782 application by Fernando Aponte Martínez ("Aponte") provides further detail on the laws with which CFE, CFEi, and public servants entering into contracts on behalf of CFE and CFEi are obligated to comply. (Aponte Decl. ¶¶ 14–18).

18. On August 4, 2021, CFEi filed a criminal complaint (the "Mexican Criminal Complaint") with the Mexican Special Anti-Corruption Prosecutor at the Mexican Federal Attorney General's Office in Mexico City, alleging that Turrent and Gutierrez had, in their capacities as public servants, awarded a series of natural gas contracts (the "Waha Connector Agreements") to WWM in contravention of Mexican law. CFEi filed the Mexican Criminal Complaint pursuant to Mexican legal obligations that require CFEi, as a wholly owned subsidiary of CFE in control of public assets, to report likely violations of Mexican law. (*See* Aponte Decl. ¶¶ 19–20, 34).

19. The Waha Connector Agreements consisted of several long-term natural gas transportation contracts that CFE granted to WWM on December 9, 2016. Under the contracts, WWM was obliged to construct a connector pipeline for CFE—the Waha Connector—and to provide transportation services on this pipeline to one of CFE's pipeline header systems in Texas called the Waha Header. The contracts also provided WWM with the rights to market and optimize transportation capacity on the Waha Connector and the Waha Header. The December 9, 2016 Waha Connector Construction Agreement, Waha Connector Intrastate Transportation Service Agreement ("TSA"), and Waha Connector NGPA Section 311 Natural Gas TSA are annexed hereto as Exhibits 3, 4, and 5.

20. Turrent held roles at both CFEi and CFE during most of the negotiations of the Waha Connector Agreements, while Gutierrez held roles at both CFEi and CFE during the entirety of the negotiations. (Aponte Decl. ¶ 31). Though CFE, not CFEi, was the signatory to the Waha Connector Agreements due to restrictions on CFEi's contracting authority in place at the time, this appears to have been a formal distinction that did not affect how the negotiations played out day to day in a practical sense or who was involved in the negotiations day to day,

and the contracts were transferred to CFEi in February 2017, just three months after they were signed (Aponte ¶ Decl. 30).

21. The Mexican Criminal Complaint specifically alleges that Gutierrez and Turrent awarded the contracts to WWM without complying with Mexican procurement laws that require CFE to adhere to an open tender bidding process and to document this process. (Aponte Decl. ¶¶ 30–32).

22. The office of the Special Anti-Corruption Prosecutor accepted the Mexican Criminal Complaint and initiated a criminal investigation into the allegations against Gutierrez and Turrent, which is ongoing. (Aponte Decl. ¶ 35).

23. CFEi and CFE, as the parties whose assets were diminished by the improper conduct in the procurement of the Waha Connector Agreements, have certain rights under Mexican law to present information and evidence to the prosecutors in the Mexican Criminal Proceeding. CFEi has already presented evidence in support of the prosecution and intends to continue to do so.[1]

24. CFEi now seeks discovery from Arbor Glen, an entity closely connected with Travis, that it believes—and I believe, based on my investigation—will be relevant and of assistance to the Mexican Criminal Proceeding. Specifically, CFEi requests testimonial and documentary discovery relating to (1) Arbor Glen's communications with WWM concerning any CFE or CFEi projects or transactions for which Arbor Glen provided any services to CFE or CFEi or about which Arbor Glen received any information from CFE or CFEi; (2) Arbor Glen's

---

[1] For a more complete representation of the events leading up to, and allegations contained in the Mexican Criminal Complaint, as well as the structure of the Mexican Criminal Proceeding, please see the Aponte Declaration.

proposed business dealings, engagement by, and work performed for CFE/CFEi and WWM, as well as related communications with those entities' directors, officers, employees, consultants, or agents; and (3) background information about the business of Arbor Glen.

25. I believe it is highly probable that Arbor Glen possesses information relevant to the Mexican Criminal Proceeding. My team and I have uncovered evidence described below suggesting that Arbor Glen consulted for both CFEi and WWM during the negotiation of the Waha Connector Agreements. During this period, Arbor Glen worked on both the Waha Connector Agreements and a related CFEi/WWM contract for the supply of natural gas (the "Waha Supply Agreement"). The documents and testimony that CFEi seeks regarding Arbor Glen's passing information on CFE or CFEi projects to WWM and the scope and nature of Arbor Glen's simultaneous consulting engagements directly relate to the Mexican Criminal Proceeding, which probes the circumstances by which Gutierrez and Turrent awarded the Waha Connector Agreements to WWM in contravention of Mexican constitutional and criminal procurement laws.

## The Personal and Professional Relationships Among Travis, Turrent, and Calhoun

26. At the time of the Waha Connector Agreements, Travis had longstanding ties to both Turrent and Calhoun. From 1998 to 1999, Travis worked at Sempra Energy in a vice president position. Turrent was Travis's coworker at Sempra during this time. In 1999, Travis and Turrent moved together to Shell Energy's energy trading group, where they both held vice president positions. Calhoun then joined them at Shell in 2000. Travis stayed at Shell through 2006, while Turrent and Calhoun departed in 2004. The three worked closely together during their tenures. Turrent's LinkedIn profile and Calhoun's CV are annexed hereto as Exhibits 6 and 7.

7

27.     While at Shell, Travis, Turrent, and Calhoun were implicated in a 2002 Federal Energy Regulatory Commission investigation into Shell's natural gas trading operation in San Diego, California. A 2016 FERC Order determined that the trading group was engaged in a manipulative and fraudulent trading scheme resulting in a "down the line" burden on California consumers of $383.8 million. *Public Utilities Commission of the State of California v. Sellers of Long-Term Contracts to the California Department of Water Resources*, 2016, 155 FERC ¶ 63,004 (2016), annexed hereto as Exhibit 8.

### Arbor Glen's Simultaneous Engagements by CFEi and WWM

28.     On July 18, 2016, CFEi and Arbor Glen entered into a Consulting Services Agreement, pursuant to which CFEi "retain[ed] [Travis], through [Arbor Glen], to provide certain consulting and advisory services to [CFEi] and its Affiliates relating to [CFEi]'s plan to develop, implement, and operate an energy and commodities marketing and trading business." Arbor Glen's engagement continued until May 2017, when CFEi and Arbor Glen terminated the agreement by mutual agreement. While retained by CFEi, Arbor Glen consulted on both CFE and CFEi projects. The Consulting Services Agreement and a May 17, 2017 email thread between Travis and Turrent discussing the termination of the engagement are annexed hereto as Exhibits 9 and 10, respectively.

29.     During this period, Arbor Glen was also consulting for WWM. I do not know the date on which this engagement began. Travis represented to Turrent that Arbor Glen stopped consulting for WWM on February 1, 2017 "to free up time and avoid any potential conflict." I do not know whether this representation was true or false. A January 30, 2017 email from Travis to Turrent in which Travis makes this representation is annexed hereto as Exhibit 11.

30.     In May 2017, the same month Arbor Glen stopped consulting for CFEi, Travis began work as WWM's Senior Vice President of Business Development. His role changed to

8

Senior Vice President of Marketing in 2020. Archived versions of Travis's biography on WWM's website showing this role are annexed hereto as Exhibits 12 and 13.

### Arbor Glen's Involvement in the Waha Connector Agreements and Related Waha Supply Agreement

31. Arbor Glen was retained by CFEi and WWM during the negotiation of the Waha Connector Agreements at issue in the Mexican Criminal Proceeding and a related natural gas supply agreement, the Waha Supply Agreement.

32. My team also investigated the Waha Connector Agreements and the Waha Supply Agreement. Our review uncovered evidence that Gutierrez and Turrent failed to engage in proper procurement processes as required by Mexican law and evidence suggesting the agreements were structured to benefit Calhoun and WWM at the expense of CFE, CFEi, and ultimately the citizens of Mexico. This evidence directly relates to the issues under investigation in the Mexican Criminal Proceeding and thus will be of direct relevance to the Mexican prosecutors.

33. Gutierrez and Turrent sought to award CFE business to WWM even though it lacked the industry experience and qualifications one would have expected from the winning bidder. Fewer than nine months after Calhoun formed WWM, CFE awarded it the Waha Connector Agreements, a set of deals with an estimated total revenue to WWM worth hundreds of millions of dollars over a term of more than twenty years. Certain affiliates of WWM, also awarded pieces of these deals, had been formed just three days prior.

34. Further, a review of email correspondence leading up to the contracts between CFE and WWM indicates that Gutierrez and Turrent conducted a sham tender process and committed to award the Waha Connector Agreements to WWM before receiving proposals from

9

other interested parties, notably Energy Transfer Partners ("ETP"), which ultimately offered a lower price than WWM.

35. My investigation has shown that Turrent, Gutierrez, and WWM conceived of the Waha Supply Agreement as part of a package with the Waha Connector Agreements and negotiated the agreements concurrently. The agreements are related in important respects. And, like the Waha Connector Agreements, Turrent and Gutierrez awarded the Waha Supply Agreement to WWM via an RFO that they steered to WWM.

36. Travis, through Arbor Glen, consulted on both the Waha Connector Agreements and the Waha Supply Agreement. With respect to the Waha Supply Agreement, he played a key role on both sides of the negotiation and in effect facilitated the coordination of WWM's bid.

37. In April and May of 2016, two months after Calhoun formed WWM, Gutierrez, Turrent, and Calhoun negotiated a memorandum of understanding ("MoU") for WWM to supply CFE with a large quantity of natural gas at the Waha Header for a term of approximately 20 years. The MoU followed an April 2016 non-disclosure agreement the parties had entered into on related terms. The MoU also referred to "associated asset management agreements." The long-term natural gas supply and asset management agreements in the MoU were the geneses for the Waha Supply Agreement and Waha Connector Agreements, respectively. The May 30, 2016 WWM-CFEi MoU, signed by Turrent, is annexed hereto as Exhibit 14.

38. On July 20, 2016, just two days after CFEi engaged Arbor Glen, Travis drafted the initial RFO for the Waha Supply Agreement (the "Waha Supply RFO") on behalf of CFEi. A copy of the July 20, 2016 RFO and the corresponding metadata for the document indicating Travis as the author are annexed hereto as Exhibits 15 and 16, respectively.

39. By August 5, 2016, Rundlof sent Turrent a draft Precedent Agreement that established that WWM would build, own, and operate what came to be the Waha Connector. The Precedent Agreement also provided many of the same terms later set out in a supply agreement that CFE awarded to WWM in early 2017. The August 12, 2016 Waha Connector Precedent Agreement is annexed hereto as Exhibit 17.

40. The effective date of the Precedent Agreement was August 12, 2016. *Id.*

41. Gutierrez solicited a Waha Connector bid from ETP on August 17, and from Natural Gas Pipeline of America ("NGPL") on August 19, even though he had apparently already agreed to award WWM the contracts pursuant to the August 12 Precedent Agreement with WWM.

42. Gutierrez also scheduled a "kick-off" meeting to commence the finalization of the agreements with WWM on September 22, on the same day CFE received ETP's bid and before even receiving WWM's formal bid the next day on September 23. Travis is listed as the "chair" of the meeting on the invitation, which he apparently sent to the other attendees. The September 22, 2016 Lateral Kick-Off Meeting Invite is annexed hereto as Exhibit 18.

43. My team reviewed the correspondence and documents of Gutierrez, Turrent, and others at CFEi at this time to determine whether they had engaged with ETP or NGPL after receiving their bids. We uncovered nothing to suggest that they had.

44. In representations that Gutierrez made to outside counsel about the procurement process for the Waha Connector Agreements, Gutierrez did not accurately portray the timeline discussed above, and falsely claimed that CFEi sought input from WWM only *after* receiving purportedly unsatisfactory offers from NGPL and ETP, thereby creating a misleading impression as to the competitiveness of the bid process.

45. In addition to attending the "kick-off meeting," Travis, using an Arbor Glen email address, also appears on emails throughout the negotiation of the Waha Connector Agreements. It is not evident from these emails whether Arbor Glen was consulting for CFE, WWM, or both. Travis does not appear to have employed any kind of "screen" between his work for the two entities.

46. In one October 2016 email, Travis asserted that Arbor Glen was representing WWM, and not CFEi, with respect to the Waha Connector Agreements and "reaffirm[ed] [Arbor Glen's] obligation to maintain the strict Confidentiality of Information it becomes privy to in carrying out the Services it performs on behalf of CFEi on the one hand and on behalf of WWM on the other hand . . . [and] reaffirm[ed] [Arbor Glen's] commitment to the highest level of integrity in maintaining strict adherence to avoidance of Conflicts in the work it performs on behalf of CFEi and WWM." I have not been able to verify whether Travis was, at this time, representing WWM, CFEi, or both entities. The October 26, 2016 Email Thread Among Travis, Gutierrez, and CFEi Counsel Ken Irvin is annexed hereto as Exhibit 19.

47. WWM submitted its bid for the Waha Supply RFO on October 11, 2016. The document's metadata indicates Travis authored the bid on behalf of WWM. The October 11, 2016 WWM Bid and accompanying metadata are annexed hereto as Exhibits 20 and 21, respectively.

48. Travis's undisclosed role as author of both CFEi's RFO and WWM's bid gave WWM an edge over other bidders through inside knowledge of how CFEi had conceived of the Waha Supply Agreement and what it would value in a bid. It is therefore no surprise that WWM "won" the bid.

49. CFEi and WWM finalized the Waha Supply Agreement in March 2017. CFEi contracted to buy 1,000,000 MMBtu/day of natural gas for a 15-year term, with delivery "[a]t the inlet to Waha Connector, to be measured at the interconnect between Waha Connector and Waha Header." The March 9, 2017 Waha Supply Agreement and June 20, 2017 amendment are annexed hereto as Exhibits 22 and 23, respectively.

50. Because WWM had not yet built the Waha Connector pipeline at the time of the Waha Supply Agreement, it could not begin delivery immediately. CFEi was forced to incur additional costs to secure a supply of gas during the pipeline construction period.

51. Without the Waha Connector Agreements, WWM arguably would not have been able to win the enormously lucrative Waha Supply Agreement.

52. As the Waha Connector Agreements are at the center of the allegations in the Mexican Criminal Complaint, it is my belief that the subpoenas attached to CFEi's application for discovery from Arbor Glen pursuant to Section 1782 seek information that is likely to be relevant to and substantially advance the Mexican Criminal Proceeding.

53. The exhibits attached to this declaration are true and correct copies of the original documents.

54. Wherefore, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

_____
Sam Anson

Date: May 4, 2022